May be seated. Good morning, ladies and gentlemen. Judge Graber and I are very pleased to be joined by Judge Kobayashi of the District of Hawaii, and thank you for taking the time out of your busy trial schedule to come and help us out on the night. My pleasure. The first two cases are submitted on the briefs, and we'll proceed to argument with the United States v. Levine. Good morning, Your Honor. My name is Russ Marsh, and I represent Edward Levine on this appeal. I'd like to reserve two minutes for rebuttal. Mr. Levine was convicted after a jury trial. The case involves the sale of rhino horns, and he was convicted of conspiracy to violate the Endangered Species Act and the Lacey Act and also a substantive count on the Lacey Act. Mr. Levine raises two issues on appeal. First, he was entrapped as a matter of law. Second, if this conviction is not overturned on this basis, he argues that the case should be remanded for resentencing because the district court improperly determined the value of the rhino horns at issue in this case. They did that in two ways. First, they used the Asian market when there is a legal U.S. market. And second, in calculating the value of the horns, they allowed an estimate of the weight when the horns could have been removed from their mounting and they could have determined the actual weight. While I will briefly address the entrapment issue, I plan to spend a majority of the time, limited time we have this morning on the sentencing issue. That's why this case was expedited, which we appreciate very much. I note that Mr. Levine has already served more than half of the 27-month sentence in this case, and in order to get the benefit of this appeal, we would need an expedited resolution. And again, we thank you for moving this case along so quickly and allowing argument this morning. May I ask you, with regard to the valuation issue, under the sentencing guidelines, it talks about the fair market value, where it can be reasonably ascertained, and where it's not, then it provides that. So we're talking about fair market value. Why is it your position that the domestic market would be the fair market value? Is there really a market domestically? There actually is a market domestically, and there's evidence in this case that there is a market domestically. Well, there was evidence that there were separate and isolated auctions where they had a certain value, but there wasn't an indication that there was a market for it. Well, we would argue that that is the market, and in this case, there was actually an auction in Virginia that was discussed by the informant here, Mr. Conrad, where the price was exactly what was paid here, which was $55,000. So we would argue in a case like this where there is a legal U.S. market. And the analogy is to the — to the — I call them the hunting guy cases, where we look to the market where the service or the item was actually sold. That's even also true in the — I'll call it the pancake tortoise case out of the defendant. Right. But in those cases, those are sort of isolated sales, and it's also — what's the significance is that it's the same amount that it was sold, because that's not the retail value. These people weren't selling it — the defendants weren't selling it on a retail market. Just like in drug cases, if you have from between the source and you're just selling it to the distributor, the distributor doesn't turn around and sell it on the street for that value. The retail market value would then be the street value. And that's what's used when we determine ranges for sentencing purposes. Well, we don't know what it would have been resold for. And in this case, it was never going to be resold, because the whole thing was a sting operation. So we're dealing in hypotheticals completely and looking at what market they were going to look at. Well, there was — there was evidence that the ultimate market is in Asia, and that there are only — one of the people testified that there are only one or two people in the world who are really in the market for these, and that, you know, there's — you know, it goes for 25 grand a pound was part of the conversation. So there was evidence, as you've described, but there was also other evidence that differed. So why was it unreasonable for the court to consider the other evidence that the sale would be in Asia? Because in these types of cases, when we are looking at the market, if there is a U.S. market, that should be the one that is used. And certainly it's going to be — it was clear it was going to be resold at a profit, but we don't know how much of a profit it was going to be. And there is case law that says that that — the amount that the seller sells to the floor. And if we can't determine what the next resale price is going to be, then it would be perfectly reasonable to use that amount. It makes a huge difference in the guidelines for levels. Well, it certainly makes a big difference. But in the commentary to Section 2Q2.1 of Sentencing Guidelines, it says, where the fair market retail price is difficult to ascertain, the court may make a reasonable estimate using any reliable information. And then it says, such as. So in this case, wasn't the evidence provided through the agent and also that National Geographic article about the Asian market and the information about the cost estimate, isn't — why isn't that sufficient reliable information for the trial court to rely on? Well, it's unreliable for a couple of reasons. And I actually think the government was caught off guard here that this was even going to be contested. You know, it had never been contested before. All the other cases in Operation Crash ended in pleas where people agreed to the Asian market price. But that doesn't determine what would apply in a contested sentencing. No, agreed. But so they put forth this information. Why isn't that reliable? Well, we're talking about huge ranges. I think we had values all the way from $15,000 up to $35,000 or $50,000. It's confusing because some of it's in kilograms. Right. You're trying to convert it. There's also evidence that the market price, perhaps because of the efforts to shut down the market, was actually — actually, that's kind of backwards economically. But the argument was that the price is going down. So trying to pinpoint it at that particular time was difficult. And so they tried to use this National Geographic article. We had the testimony from the agent. And, of course, the part that was most flawed about that is they could have removed the horns from the mounting. I mean, and then you could have actually done a formula. Even using their Asian market theory, use a price per pound times weight. And, I mean, this Court would never let the government get away with that in a drug case. I mean, if you had — their excuse was, well, we didn't want to damage the evidence. Well, I mean, at this point, we're at sentencing. If for some reason it were remanded, there could have been stipulations done. There were pictures. I mean, there's absolutely no reason. Right. They could have done that, but they didn't. So why is that, though, unreasonable, though? I mean, it's not what's possible. It's what's reasonable, right? So there was a reasonable estimate that was given. And, in fact, the sentencing court decided to what we've referred to as a low estimate, right, with regard to just the horns. There was reliable testimony, arguably, by the scientist. I can't remember his name. Dr. Espinoza. Right. Who approximated it, right? And why isn't that — it doesn't have to be exact, but it certainly has to be a reasonable basis. It doesn't. But when we're talking about what's at issue here in months of a person's life, I think you should be even more reasonable. As I said, it could have been lower. There's another suggestion that's out there when we talk about resale is the sale for $120,000. I mean, that's another one. That would have made a two-level difference. I understand that the judge is trying to estimate it. But here, again, when we're doing a formula, there's no reason why they couldn't have weighed their horns. And I'll save some time for rebuttal. Thank you, Judge.  Thank you, counsel. Good morning. May it please the Court, Emily Palachuk on behalf of the United States. Rhinoceros horn trafficking is a global problem, and that is why we are looking at a global market when it comes to sentencing. And the trophies that are here in the United States are being used to fuel the demand that exists in Asian countries. Mr. Levine, in this case, willfully and voluntarily engaged in an illegal interstate sale of a rhinoceros horn. Why didn't the government take the horns off of the mounting and weigh it? Your Honor, I would just simply say that, as we've mentioned in our brief, at the time that the horns were still in the government's custody, it was believed that this would be stipulated to us. As opposing counsel mentioned, this is the first case where the value of the horns has really been contested. So it was, you know, that's simply why the horns weren't taken off. There was also concern about damaging them. It's not just removing the screws. If you take a look at the picture of the horn that's in our brief, you can see that the horn is also surrounded by plaster. There was concern that trying to remove the plaster as well as the wood could cause damage to the horn in the event that there needed to be further proceedings before the court. So that's why. But I would point out that the ---- Why would it matter if the horns were damaged? You're not trying to sell them, are you? No. It's simply in presenting them to the jury and trying to then, you know, present exactly what the evidence was. It just simply didn't happen. And so at this point, as has been mentioned, we're at the point where they weren't weighed. So the question is whether or not the district court abused its discretion when it estimated the weight of the horns. And here there was testimony from the agent that he weighed the horns and the mount, and they were 16.4 pounds. He presented testimony that the scientists estimated that the horns were somewhere between 12 to 13 pounds. And then the government used a conservative estimate of 10 pounds for purposes of the pre-sentence report, and the district court adopted that 10-pound valuation. So it could be that if the horns were weighed, they could be more. And if the court were to then use the per-pound values that it did use here, the defendant could be looking at a valuation that's more than $250,000. So he was given the benefit of the doubt at every level of the estimation here. And that's for that reason it was not an abusive discretion for the district court to make that estimate. Now, the other defendant, Kwan, in his trial, it stipulated to the weight or to the value? That's right. He actually didn't go to trial. He pleaded guilty and stipulated that the horns weighed between $250,000 to $300,000 or, I'm sorry, that they were valued at $250,000 to $300,000. Your opposing counsel makes the argument that this would not be a reasonable basis for the sentencing court if it was an illegal substance, say it was methamphetamine or heroin or cocaine. It wouldn't be sort of a guesstimate. There would be an exacting amount that would be required. Why is this different? Well, we're not talking about a substance that is weighed as a matter of course. It's not in baggies and can be removed. It's screwed into a wooden slat with plaster built up around it to create that illusion of being the rhinoceros snout. It's not a simple matter of setting it on the scale. It's actually having to remove it very carefully and without damaging the keratin. So we're just not talking about the same type of substance here. So in terms of assessing what the fair market value is, what's your best case on what market we should use? I think that both the IUM case with the pancake tortoises, and then I'd also point the Court to the Fourth Circuit case of Dove, U.S. v. Dove. And that was a case that dealt with the bear gallbladders. And in that case, the defendant lived in West Virginia. And in West Virginia, it was legal to sell bear gallbladders within the State. But he was engaging in a trafficking operation with individuals who lived in Virginia. And in that case, the defendant argued that the Court should be using the price of the gallbladders where he was selling them, where they were legal in West Virginia. And the district court instead used an estimated value, the highest value that the ultimate consumers in Virginia had paid. Even though there was a legal market in West Virginia, the Court said that in this case, the ultimate consumer was paying more because they were getting, they were smuggling the bear gallbladders into the market. Right. But doesn't that support the defendant's theory that you use the market in which the transaction occurs? You use the market in which the ultimate consumer exists. Right. And so what was the other question? The guideline refers to retail sales. So you have to figure out what is the retail sale that is most likely to occur. Right. It's both. It's absolutely the application note. And the IUMK talks extensively about how the application note is clear on its face. And so we're not talking about an instance where the rule of lenity applies. But moreover, I'd also point out that here we're talking about the Lacey Act. And the Lacey Act is intended, as was discussed in the Bernal case, the point of the Lacey Act is to protect imperiled wildlife populations by gradually drying up the international market for endangered species, thus reducing the poaching of any such species in the country where it's found. Here, the market that is causing the risk to the existence and continued survival of the rhinoceros is the Asian market. They're really, we're not talking about two separate markets here. It is a global market. The rhinoceros horns that are sold in the United States are ending up in Asia. Right. But in this particular case, there was no evidence that these horns were going to be marketed in Asia, was there? Well, I think that there is. I mean, all the evidence was there was a transaction that occurred in the United States, sale in the United States. In terms of the relevant market for this, it would appear to be the United States, even though there was a global market. Well, I'd say that there isn't any evidence that they were not headed to Asia either. And the assumption But it's the government's burden. Well, the assumption, but you also have to view the evidence in the light most favorable to the government here, given that we're talking about Rule 29, and we're also looking at an abusive discretion standard for reviewing the sentence. I'm talking about the sentencing. That's not a Rule 29. That's right. I apologize. It's an abusive discretion standard. And as was previously mentioned, the sentencing guideline specifically says that the court may make any reasonable estimate of the market value based on any reliable information. Here, the government presented ample reliable information that what is causing the harm to the rhinoceros is the Asian market. And also the Didn't Kwan say at one point to this defendant, I hear it's now going for 25 grand a pound? Yes. At the time that the when the sale took place in the hotel, when Agent Juergens was speaking with Kwan, they pulled the rhinoceros horns out of the suitcase. And the agent talks about how they have a great weight and how the weight is really going to help him with the resale. Kwan says, yeah, I hear that they're going for 25,000 a pound now. And Agent Juergens says almost 30. And Kwan says, wow, that's that's I hope you do really well. That's the exchange that takes place. There's also evidence where Kwan is talking about how a libation cup that he emails to Agent Juergens. He says that if this made it to Hong Kong or China, it can go for two to five hundred thousand dollars. So it's clear that Mr. Kwan is aware that these horns are going to Asia. He also sold a horn to Felix Ka, who if you look at the Hess case with the Iowa defendant, Felix Ka was sending rhinoceros horns to Taiwan and China. I'd also point to Court the various so-called legal domestic markets that the defendant points out in his brief. Each one of these was an illegal sale. That's why they're being brought up in a case. These are citations from sentencing memorandums. So each one of these sales was illegal. The Zhao case was a sale to a Chinese national. Qi, it was a sale to a Chinese national. These horns, even though they're being sold in the United States, they are ending up in the hands of Asian consumers. So that's really the market that we're talking about here. We don't have two separate markets. It's one global market that is caused, you know, leading to the extirpation of this species. So for those reasons, the Court did not abuse its discretion when it relied on the reliable information that the government presented at the time of sentencing. Thank you, Counsel. Thank you. I'd like to make two or three quick points. First, there is a market for trophies, and that's what this was at the time. Mr. Levine had no knowledge of this foreign market or that this hypothetical sale was going to take place overseas. And to attribute the conversation with Quan in a hotel room right before he's arrested when Levine's not there and doesn't know anything about it is extremely unfair under these circumstances. Finally, we're looking for a very limited remedy here and one that can be limited to this set of facts. We're not looking for some expansive decision like the government is talking about foreign markets. We're looking for a remand on a closed record setting the price of $55,000, which is what the parties agreed to. But, Counsel, isn't this our standard remand for resentencing on an open record? Isn't that how it's normally done? Yes, it is. But in this case, where we're asking that a specific price be set, there would be no purpose for that. As well, the government would be getting a second bite at the apple. They had a full chance to argue this below. And under those limited circumstances, a closed record would be appropriate. I also think it's appropriate that we use the legal market here to talk about entrapment for two seconds. The defendant was trying to make a legal sale in the U.S. He didn't know about the foreign market and it would be unfair to set a market price based on that foreign market when he was trying to do a legal sale in California and was entrapped by the government into crossing state lines. Thank you. Thank you, Counsel. The case just argued will be submitted for decision.
judges: Thomas, Graber, Kobayashi